# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

GERALD S. MADISON,         )
                              )

          **Plaintiff,**          )

                              )    **Civil Action No. 2:03-0080**

    **v.**                      )    **Judge Nixon / Knowles**

                              )

**JO ANNE BARNHART,**       )
**Commissioner of Social Security**    )

                              )

         **Defendant.**        )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Pleadings. Docket Entry No. 9. Defendant has filed a Response, arguing that the Commissioner's decision is supported by substantial evidence, and requesting that the Court "grant her Motion for Summary Judgment."[1] Docket Entry No. 17.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Pleadings be DENIED, and that the decision of the Commissioner be

---

[1]Technically, the Commissioner has not filed a Motion for Summary Judgment. But because Defendant opposes Plaintiff's Motion, and because the Commissioner's decision must be upheld if it is supported by substantial evidence, the fact that Defendant has not actually filed a Motion for Summary Judgment is of no consequence.

Case 2:03-cv-00080   Document 21   Filed 07/15/05   Page 1 of 32 PageID #: 1

AFFIRMED.

# I.  INTRODUCTION

Plaintiff filed his applications for DIB and SSI on December 11, 1995, alleging that he

had been disabled since November 15, 1994, due to arthritis and depression.  Docket Entry

Number 7, Attachment ("TR"), TR 42-44; 81-88; 98.  Plaintiff's applications were denied both

initially (TR 68-73; 91-96) and upon reconsideration (TR 79-80; 97-100).  Plaintiff subsequently

requested (TR 101-102) and received (TR 23-41) a hearing.  Plaintiff's hearing was conducted

on June 25, 1997, by Administrative Law Judge ("ALJ") Peter Edison.  TR 23-41.  Plaintiff

appeared and testified at the hearing.[2]  TR 23.

On December 11, 1997, the ALJ issued a decision unfavorable to Plaintiff, finding that

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR

11-20.  Specifically, the ALJ made the following findings of fact:

> 1. The claimant has not engaged in substantial gainful activity
>    since November 15, 1994.
>
> 2. The claimant met the disability insured status requirements
>    of the Social Security Act on November 15, 1994, the date
>    the claimant stated he became unable to work, and meets
>    them through December 31, 1998.
>
> 3. The claimant has the "severe" impairment of mild
>    inflammatory arthritis.
>
> 4. His impairment does not meet or equal the criteria of any
>    impairment listed in Appendix 1, Subpart P, Regulations
>    No. 4.
>
> 5. The effect of the claimant's physical impairment limits him
>    to light work.

---

[2]No Vocational Expert testified at this hearing.

6.      The claimant is a younger individual (20 CFR 404.1563 and 416.963) with a [*sic*] 11th graded [*sic*] education (20 CFR 404.1564 and 416.964).

7.      The claimant was not entirely credible concerning the severity of his pain.

8.      The claimant is unable to return to his past work. Therefore, the burden of proof shifts to the Commissioner to show that there are jobs he could perform considering his age, education, work experience, and residual functional capacity.

9.      The burden of proof has been met in this case by application of Vocational Rule 202.18 which directs a decision of not disabled.

10.     The claimant has not been "disabled" for a period of disability, disability benefits or supplemental security income at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

TR 16.

On January 8, 1998, Plaintiff timely filed a request for review of the hearing decision. TR 6-7. On January 29, 1999, the Appeals Council issued a letter declining to review the case (TR 4-5), thereby rendering the decision of the ALJ the final decision of the Commissioner.

Plaintiff thereafter filed a civil action in the United States District Court for the Middle District of Tennessee[3]. TR 203. On December 6, 2000, Plaintiff's case was remanded to the Commissioner for further administrative proceedings. *See* TR 300-320. The Appeals Council subsequently remanded the case to the ALJ. TR 321-322.

Plaintiff received another hearing. TR 245-263. Plaintiff's second hearing was conducted on January 11, 2002, by Administrative Law Judge ("ALJ") Peter Edison. *Id.*

_____

[3]The case number for Plaintiff's first civil action was 3:99-0275. TR 301.

Plaintiff and Vocational Expert ("VE"), Kenneth Anchor, appeared and testified at the hearing.

TR 245.

On May 13, 2002, the ALJ issued a decision unfavorable to Plaintiff, finding that

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR

231-239. Specifically, the ALJ made the following findings of fact:

1. The claimant met the disability insured status requirements of the Act on November 15, 1994, the date the claimant stated he became unable to work, and continued to meet them through December 31, 1998, but not thereafter.

2. The claimant has not engaged in substantial gainful activity since November 15, 1994.

3. The medical evidence establishes that the claimant has a combination of impairments that is severe, including hydrenitis suppurativa with secondary inflammatory arthritis, but that he does not have any impairment or combination of impairments of the level of severity required by 20 CFR Part 404, Subpart P, Appendix 1.

4. The evidence establishes that the claimant has not experienced any pain or other symptomatology of a disabling level of severity on an ongoing basis.

5. The claimant retains the residual functional capacity to perform light work, with up to 20 pounds of lifting, which allows for alternate standing and sitting during the weekday.

6. The claimant is unable to perform his past relevant jobs as a concrete pourer/finisher or as a groundskeeper, jobs involving at least medium work.

7. The claimant was 45 years old, a younger individual, as of the alleged onset date of Disability, and is currently 52 years old, a person closely approaching advanced age. 20 CFR 404.1563 and 416.963.

8. The claimant completed the eleventh grade in formal

4

education, a limited education.  20 CFR 404.1564 and 416.964.

9.    The claimant performed some semiskilled work during his vocationally relevant past, but his job skills would not be transferable to other work.  20 CFR 404.1568 and 416.968.

10.   Based on an exertional capacity for light work, and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4 and 416.969 of Regulations No. 16, and Rules 202.11 and 202.18, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

11.   Although the claimant's limitations do not allow him to perform the full range of light work, using the above-cited rules as a framework for decisionmaking, there are a significant number of jobs in the national economy which he could perform.  Examples of such jobs are: production technician, machine tender, table worker, table worker, packer, polisher, and folder.  The vocational expert testified that there are about 20,000 of the named sample jobs in existence in Tennessee; a significant number of jobs.

12.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.  20 CFR 404.1520(f) and 416.920(f).

TR 238-239.

On May 20, 2002, Plaintiff submitted a document entitled "Exceptions to the ALJ's Decision" to the Appeals Council.  TR 223-229.  On June 13, 2003, the Appeals Council issued a letter declining to review the case (TR 221-222), thereby rendering the decision of the ALJ the final decision of the Commissioner.  This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. §§ 405(g) and 1383(c)(3).  If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive.  *Id.*

5

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to arthritis and depression.  TR 98.

Dr. William Adams examined Plaintiff on August 3, 1989, for complaints of pain in his shoulders, knees, and elbows, which Plaintiff reported was worse in the morning.  TR 392.  The results of Plaintiff's examination were "fairly normal."  *Id.*

Plaintiff reported improvement to Dr. Adams on August 10, 1989 and September 11, 1989.  TR 392.

Plaintiff returned to Dr. Adams on October 3, 1989.  TR 392.  Dr. Adams noted: "has a lot of pain across the back, shoulders, legs and pain mostly in right shoulder and cannot see deformity and see no loss of motion, slightly tender to palpation.  Not localized to a muscle group."  *Id.*

Plaintiff again returned to Dr. Adams complaining of pain in his elbow.[4]  TR 392.  Dr. Adams noted that Plaintiff had "lateral epicondylitis" in his right elbow.  *Id.*  Dr. Adams placed Plaintiff's right arm in an elbow support and prescribed medication and exercises.  *Id.*

Plaintiff returned to Dr. Adams on November 20, 1989, reporting that his arm pain had subsided and that he had been doing exercises with his arm.  TR 392.  Dr. Adams noted that Plaintiff had some tenderness in his arm, but that he was improving with time.  *Id.*

On August 16, 1995, Plaintiff was evaluated by Dr. Howard Fuchs at the Vanderbilt University Medical Center for "generalized joint pain."  TR 215.  Plaintiff reported that Naprosyn was the most helpful medication, although he stated that it did not totally resolve his

---

[4]The date on this record is illegible.

6

pain.  *Id.*  On examination, Plaintiff was "very tender" in multiple joints with no swelling, and his strength was "normal and symmetrical," as were his sensation and reflexes.  *Id.*  It did not appear to Dr. Fuchs that Plaintiff had rheumatoid arthritis.  *Id.*

Dr. Fuchs was concerned that Plaintiff had arthritis associated with hidradenitis and prescribed Doxycycline for the next six weeks.  TR 215.  Dr. Fuchs referred Plaintiff to a dermatologist because he was concerned that "his arthritis will not improve while his skin disease is active."  *Id.*

Pursuant to Dr. Fuchs' referral, Plaintiff was seen at the dermatology department of Vanderbilt University Medical Center with complaints of cysts under his arms for the past six to ten years.  TR 180-181.  Plaintiff had been taking Doxycycline, which had decreased the tenderness and drainage under his arm.  *Id.*  At the time of his examination, Plaintiff reported no pain, but reported that he had experienced occasional drainage and pain.  *Id.*  On examination, Plaintiff had several firm "subcutaneous nodular lesions in both axillae," with evidence of postinflammatory changes and scarring.  *Id.*  The examining physician's impression was hidradenitis, and he prescribed medication and ointment.  TR 182-185.

On September 5, 1995, Plaintiff was evaluated for hidradenitis and arthritis.  TR 184.  Plaintiff was assessed with hidradenitis and small joint arthritis, both of which were reportedly "better."  *Id.*

On re-evaluation on December 5, 1995, Dr. Fuchs noted that Plaintiff continued to improve with regard to his skin disease, but he continued to experience joint problems.  TR 214.  On examination, Plaintiff was found to have multiple sites of tendinitis and Plaintiff's medication was changed.  *Id.*  Plaintiff was advised to return in two to three months.  *Id.*

7

In December 1995, Plaintiff reported in a "Disability Report" form that he spent two to three hours a day cooking and doing "odd jobs" around the house, that he spent two hours a week fishing, and that he did "some" hunting. TR 128.

In January 1996, Plaintiff reported in an "Activities of Daily Living Questionnaire" that his condition did not affect his ability to think or concentrate. TR 155. Plaintiff reported that he hunted or fished and did yard work and chores when he was able. TR 156. Plaintiff reported that he cooked for himself on a daily basis, washed dishes, vacuumed, and did lawn work once a week. *Id.* Plaintiff reported that he went food and clothes shopping twice a month. TR 157. Plaintiff's hobbies/activities included hunting, fishing, watching television, reading, and target shooting. *Id.* He reported engaging in these hobbies/activities once or twice a week. *Id.* Plaintiff reported reading about an hour a day, watching television for approximately three hours a day, and taking care of his beagles. TR 157-158.

On February 2, 1996, Plaintiff was psychologically evaluated by Michael Rohr. TR 190. Plaintiff reported that his medication "took the edge off." *Id.* Plaintiff reported no family history of psychiatric problems. TR 191. Plaintiff indicated that he had stopped working because of pain, and he reported that he was in constant pain in his knees, arms, elbows, shoulders, knees, and occasionally his hips. *Id.* Plaintiff had not sought psychiatric treatment, although he was on "nerve medication." *Id.* Plaintiff reported experiencing depression because he could no longer provide for his family, and he noted having occasional crying spells. *Id.* He reported no suicidal thoughts, hallucinations, delusions, or paranoia, but reported being "grossly more irritable." *Id.* His daily activities included arising at 5:00 a.m., returning to bed at 7:00 a.m., and arising again at approximately 8:30 a.m. TR 192. Plaintiff reported that he would get

8

up, take care of a couple of dogs, and then come back inside and watch television. *Id.* Plaintiff stated that he was able to cook supper, do the dishes, and vacuum, and that he would go to bed around 11:30 p.m. or midnight. *Id.*

Dr. Rohr noted that Plaintiff reported limitation in what he could do physically. TR 192. Plaintiff indicated that he would not be able to sleep without medication, and that even with medication, he still experienced occasional sleeping problems. *Id.* Plaintiff stated that he dressed himself, cared for his personal needs, and occasionally went shopping with his wife. *Id.* Dr. Rohr noted that Plaintiff got along well with people, and that Plaintiff visited different friends in the area. *Id.*

On mental status examination, Plaintiff's speech was "spontaneous"; he was "relevant and coherent" and his mood and affect was "appropriate." TR 192. Plaintiff displayed "mild difficulty with time," but appeared "oriented to person, place, and circumstance." *Id.* Plaintiff's immediate memory was "poor," but his memory for recent events was "good." TR 192-193. Plaintiff's simple mental calculation skills were "good," and he could calculate "serial sevens." TR 193. Plaintiff's "[f]und of verbal information" was "borderline," his abstract reasoning appeared to be in the "low average" range, and his judgment was "good." *Id.*

Dr. Rohr opined that Plaintiff was functioning "at least in the Low Average range" verbally, and that his depression was related to his pain and his perception that he could not work. TR 193. Plaintiff could not think of any job that he might be able to perform comfortably with his pain. *Id.* There was no gross difficulty concentrating and there was no reported difficulty with immediate memory around the house. *Id.*

Plaintiff was "more irritable and seems to fly off the handle as a chronic pain patient";

however, he "seems to have always gotten along well with people and there is no history of behaviors that were not socially acceptable." TR 193. Dr. Rohr felt that Plaintiff's major problem in working would be his chronic pain syndrome; Dr. Rohr's Axis I impression was "Adjustment Disorder With Mixed Emotional Features Due To Chronic Pain." *Id.*

On February 6, 1996, Plaintiff was evaluated by E. Dewey Thomas with complaints of pain in his knees, left elbow, left shoulder, and ankles. TR 188. Plaintiff reported that he had quit working as a cement finisher one year earlier because of pain in his knees and ankles, and prolonged standing. *Id.* His hand examination revealed no deformities and there was full range of motion in the fingers, wrists, elbows, and shoulders. *Id.*

Dr. Thomas noted some tenderness over the lateral epicondyle of Plaintiff's left elbow indicating a "possible Tennis Elbow," but his knee and ankle examination revealed a full range of motion. TR 188-189. Dr. Thomas noted that Plaintiff had grade "II+ chondromalacia" of the patella of the left knee and grade "I+ chondromalacia" of the right knee. *Id.* Plaintiff was able to heel/toe walk and squat fully without difficulty. *Id.* Based on his examination, Dr. Thomas opined that Plaintiff was capable of lifting/carrying 50 pounds occasionally and 25 pounds frequently, standing/walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday. TR 186-187.

Plaintiff returned to the Vanderbilt University Medical Center on May 13, 1996. TR 403. It was noted that Plaintiff had tenderness in his elbow, and that he had joint problems in his left elbow, left knee, and both ankles. *Id.*

On January 7, 1997, Dr. Fuchs reported that Plaintiff "actually is doing fairly well with regards to his mild inflammatory arthritis," and found his hidradenitis was "under fairly good

10

control." TR 212. Dr. Fuchs later indicated on January 7, 1997, that Plaintiff "looked about as well as I had seen him," and felt that it was "unlikely" that his arthritis would become "a deforming process." TR 209. On April 28, 1997, Dr. Fuchs indicated that trials of different medications had not provided "optimal relief," and a chemistry profile and CBC were "unremarkable." *Id.* On May 6, 1997, Dr. Fuchs referred Plaintiff for evaluation of lower extremity pain, and he indicated that he had treated Plaintiff for several years for mild inflammatory arthritis which was presently "fairly well controlled" by medication. TR 211. It was noted that the results of EMG and nerve conduction studies performed in 1995 were "normal." *Id.*

Dr. Fuchs opined that Plaintiff was unable to perform most activities because of his joint pain and swelling in the small joints of his hands and feet. TR 209. Dr. Fuchs further opined that Plaintiff could lift/carry 10 pounds on an infrequent basis; that, because of his knee and foot pain, Plaintiff could not stand or walk for prolonged periods of time; that Plaintiff could sit for at least four hours a day before becoming uncomfortable; that Plaintiff would be unable to climb or balance, stoop, crouch, knees, or crawl; and that Plaintiff's ability to reach, handle, push, and pull would be affected by his "small joint troubles." *Id.*

On June 9, 1997, Plaintiff was evaluated by Dr. Toufic Fakhoury for complaints of lower extremity pain since 1990. TR 217-220. Plaintiff reported pain in the knees, elbows, and ankles, with "radiation of the pain from the lateral aspect of the knees down the lateral aspect of both legs to the level of an [*sic*] ankles." TR 218. Plaintiff described his pain as "dull, with an occasional burning component" which was "exacerbated by excessive motion." *Id.* Plaintiff did not report any "sharp" pain, nor did he report a constant nighttime increase in pain. *Id.* Plaintiff

11

denied experiencing pain in his feet, numbness or tingling in his lower extremities, bladder problems, or gait unsteadiness. *Id.* No similar upper extremity complaints were reported. *Id.* Dr. Fakhoury noted that the results of nerve conduction tests and an EMG conducted two years earlier had been "normal." *Id.* Plaintiff reported no "significant lower back pain with radiation into the lower extremities." *Id.*

On examination, Plaintiff was "well oriented" with "normal" speech and memory function. TR 219. Plaintiff's cranial nerve and motor examinations were "normal," and his sensory examination revealed a "hypercusis in the lateral aspect of both lower extremities," but otherwise revealed no abnormalities. *Id.* Plaintiff's stance and gait, including tandem walking, were "normal," and Dr. Fakhoury felt that Plaintiff's reported symptoms were consistent with arthritis. *Id.*

Dr. Fakhoury noted that Plaintiff's history and findings did not suggest the presence of a peripheral polyneuropathy, mononeuritis, or other form of mononeuropathy in the lower extremities. TR 219-220. Dr. Fakhoury explained to Plaintiff that there was no definite etiology of the pain in his lower extremities except for the known arthritis. TR 220. Dr. Fakhoury noted that there was no explanation for Plaintiff's reported radiating pain from his knees to his ankles because there was no evidence of nerve damage in the lower extremities.[5] *Id.*

Plaintiff was seen again on March 9, 1998, at the Vanderbilt University Medical Center. TR 368. It was noted that Plaintiff's "arthritis has changed little since last visit," and that Plaintiff had arthritis in his elbows, knees, and ankles. *Id.* Point tenderness was also noted in

_____

[5]As discussed above, Plaintiff denied having lower back pain with radiation into his lower extremities, but he claimed to have radiating pain from his knees to his ankles.

12

Plaintiff's elbows.[6]  *Id.*

Dr. Ferris Hallmark submitted medical records dated February 24, 1999 through April 24, 2000.[7]  TR 329-351.  Dr. Hallmark also submitted an undated Range of Motion Exam of Plaintiff.  TR 346-350.

On May 17, 1999, Dr. Hallmark examined Plaintiff, who complained of soreness after "working or bending over."  TR 342.  Dr. Hallmark noted that Plaintiff's lower back was tender, and recommended that Plaintiff apply heat.  *Id.*

On May 19, 1999, Plaintiff returned to Dr. Hallmark, complaining of stiffness in his lower back.  TR 342.  Plaintiff reportedly told Dr. Hallmark that when he "over does an activity," he would be in a lot of pain.  *Id.*  Dr. Hallmark noted that Plaintiff's lower back was "Taut + Tender" and that his condition was "essentially the same."  *Id.*  On May 21, 1999, Plaintiff returned to Dr. Hallmark, who noted that Plaintiff's condition was "improving."  *Id.*  Plaintiff reported continued pain and stiffness on May 24, 1999; May 26, 1999; and May 28, 1999.  TR 341.  On June 1, 1999, Dr. Hallmark noted that Plaintiff was "Showing Improvement," but, on June 11, 1999, noted that Plaintiff showed "mild regression."  TR 340.  On June 14, 1999, Dr. Hallmark noted once again that Plaintiff was "showing improvement."  *Id.*

On June 16, 1999, Dr. Hallmark examined Plaintiff, for complaints of pain and stiffness in his lower back.  TR 339.  Dr. Hallmark noted that Plaintiff's condition was "essentially the same."  *Id.*

On June 18, 1999, Dr. Hallmark again examined Plaintiff for complaints of stiffness in

---

[6]The notes of this visit appear to have been made by several different people and appear to have been signed by Dr. Fuchs.

[7]Many of these records are illegible.  TR 330-338.

his lower back. TR 339. Dr. Hallmark noted that Plaintiff was "showing minimal improvement." *Id.*

In a letter dated August 16, 1999, Dr. Fuchs reported that he had examined Plaintiff for arthritis since 1995, and that Plaintiff "looks about as well as I have seen him today." TR 363. Dr. Fuchs noted that Plaintiff "cannot do very much, as he has severe exacerbation of his joint pain and swelling whenever he increases his physical activity." *Id.*

Dr. Fuchs examined Plaintiff on May 14, 2001. TR 358. Plaintiff complained of joint pain, and Dr. Fuchs noted that Plaintiff was taking Tolectin, Neurontin, Doxycycline, and Tylenol Number 3. *Id.* Dr. Fuchs' impression was that Plaintiff had "done well" on these medications. *Id.* Dr. Fuchs also noted that Plaintiff's hidradenitis "continues to be active." *Id.*

Dr. Hallmark examined Plaintiff on June 14, 2001. TR 386-388. Plaintiff complained of skin problems, cysts, and knee pain. TR 386. Dr. Hallmark noted that Plaintiff described his knee pain as "severe" and "constant." *Id.* Dr. Hallmark also noted that Plaintiff's knee pain had been ongoing for six years. *Id.* Dr. Hallmark's diagnoses were cellulitis and abscess of unspecified sites. TR 388.

Plaintiff returned to Dr. Hallmark on July 16, 2001, complaining of cysts under both arms, knee pain, wrist pain, and thumb pain. TR 383. Dr. Hallmark's diagnoses of Plaintiff were: "cellulitis and abscess of unspecified sites"; "other tenosynovitis of hand and wrist"; and knee pain. TR 385.

Plaintiff returned to Dr. Hallmark on August 15, 2001, complaining of cysts under his arms and pain in his leg and knee. TR 380. Plaintiff also complained of skin lesions. *Id.* Dr. Hallmark noted that Plaintiff had a full range of motion in all joints, but that Plaintiff felt pain

14

when he moved his knee.  TR 382.  Dr. Hallmark's assessments were "knee pain," "pain in joint involving lower leg," and "axilla, NOS."  *Id.* (capitalization omitted).  Dr. Hallmark ordered an x-ray exam of Plaintiff's knees and prescribed medications.  *Id.*

An x-ray of Plaintiff's knee taken on August 21, 2001, revealed that "[t]here are no fractures, dislocations or other bone or joint abnormalities visualized of the left knee."  TR 389-390.

Plaintiff returned to Dr. Hallmark on September 17, 2001, complaining of pain in both knees and cysts in his underarms.  TR 377.  Plaintiff described his knee pain as "moderate."  *Id.* Plaintiff had a full range of motion in all joints, but Plaintiff felt pain when he moved his knee. TR 379.  Dr. Hallmark's assessments were "pain in joint involving lower leg"; "knee pain"; and "cellulitis and abscess of unspecified sites."  *Id.* (capitalization omitted).  Dr. Hallmark also prescribed medications.  *Id.*

Plaintiff returned to Dr. Hallmark on October 8, 2001, complaining of cysts under his arms and knee pain.  TR 374.  Dr. Hallmark again noted that Plaintiff described his knee pain as "severe."  *Id.*  Dr. Hallmark noted that Plaintiff had a full range of motion in all joints, but that Plaintiff felt pain when he moved his knee.  TR 376.  Dr. Hallmark's assessments were: "knee pain"; "cellulitis and abscess of unspecified sites"; "pain in joint involving lower leg"; and "axilla, NOS."  *Id.* (capitalization omitted).  Dr. Hallmark prescribed medications.  *Id.*

Plaintiff returned to Dr. Hallmark on November 7, 2001, complaining of increasing knee pain and skin problems.  TR 412.  Dr. Hallmark's assessments were: "pain in joint involving lower leg" and "cellulitis and abscess of unspecified sites."  TR 413.

Plaintiff returned to Dr. Hallmark on December 7, 2001, complaining of pain in his

15

knees, cysts under his right arm, and a cyst located on his tailbone.  TR 409.  Dr. Hallmark's

assessments were: "pain in joint involving lower leg"; "cellulitis and abscess of unspecified

sites"; and "other tenosynovitis of hand and wrist."  TR 410.  Dr. Hallmark prescribed

medications.  *Id.*

Dr. Hallmark completed a "Medical Opinion Form" regarding Plaintiff on December 28,

2001.  TR 415-417.  Dr. Hallmark opined that Plaintiff could sit for two hours in an eight-hour

workday, but that he could sit for no more than 30 minutes at a time.  TR 415.  Dr. Hallmark

further opined that Plaintiff could stand and/or walk for three hours in an eight-hour workday,

but that he could stand for one hour at a time.  *Id.*  Dr. Hallmark opined that Plaintiff could

infrequently" lift and/or carry 11-20 pounds.[8]  *Id.*  Dr. Hallmark noted that Plaintiff could never

use his hands for fine manipulation, and that he could infrequently bend at the waist, reach above

his shoulders, and stand on a hard surface.  *Id.*  Dr. Hallmark noted that Plaintiff did not require

bedrest during a normal workday, but that Plaintiff had problems with stamina and endurance

which would require him to rest more than was normally allowed.  TR 416.  Specifically, Dr.

Hallmark noted that Plaintiff required 10 minutes of rest for every three hours of work.  *Id.*  Dr.

Hallmark opined that Plaintiff could not be reasonably expected to be reliable in attending a full

time work week.  *Id.*  Dr. Hallmark reported that Plaintiff's pain was "severe" and that it was

"reasonable" that Plaintiff's pain would cause lapses in his concentration or memory several

hours each day.  *Id.*  Dr. Hallmark concluded by stating that Plaintiff had a "reasonable medical

need to be absent from a full time work schedule on a chronic basis."  TR 417.

_____

[8]Dr. Hallmark did not complete the remainder of the section regarding the amount of
weight Plaintiff could lift or carry.

16

### B.  June 25, 1997 Hearing

### Plaintiff's Testimony

Plaintiff was born on June 11, 1949, and has an eleventh grade education.  TR 25-26.

Plaintiff testified that he went to vocational school, and that he studied "machine shop."
TR 26.  Plaintiff reported that the last time he worked on a full time basis was in November of
1994 or 1995.  *Id.*  Plaintiff further reported that his last employer was Glen Fitzpatrick in
Grandville.  *Id.*  Plaintiff added that his last job was with a cement company, and that he poured
and finished cement in this job.  *Id.*  Plaintiff reported that, in this job, the heaviest thing that he
had to lift weighed approximately 30 pounds.  TR 26-27.  Plaintiff stated that he worked in this
job for approximately three years.  TR 27.

Plaintiff testified that before working for the cement company, he worked in New York
for George Rooky as a maintenance worker.  TR 27.  Plaintiff reported that in this job, he
worked on furnaces, worked on buildings, and did "minor construction."  *Id.*  Plaintiff stated that
he worked in this job for "about two and a half years."  *Id.*

Plaintiff testified that prior to that maintenance job, he worked in maintenance for the
Shaker Museum for "10 years."  TR 27.  Plaintiff reported that in this job, his responsibilities
were "lawn mowing, remodeling, building exhibits with minor repairs," and performing other
repairs.  TR 27-28.  Plaintiff reported that the Shaker Museum was in Old Chatham, New York.
TR 28.  Plaintiff could not recall any other jobs that he had performed in the past 15 years.  *Id.*

Plaintiff testified that his primary disabling conditions were his "ankles and legs and
arms and shoulders where I get a lot of pain and can't do a lot of standing or sitting."  TR 28.

Plaintiff added that Dr. Fuchs[9] was treating him for these conditions.  *Id.*  Plaintiff stated that he

had an appointment to see Dr. Fuchs in September.  *Id.*  Plaintiff added that, at the time of the

hearing, Dr. Fuchs had "got me on medication."  *Id.*

Plaintiff stated that Dr. Fuchs had not shared his diagnoses with him, but that Dr. Fuchs

said that Plaintiff had arthritis and "something else."  TR 29.  Plaintiff described his pain as

being "around the joints," and added that the pain was outside his knees, down his leg, and

around his ankles.  *Id.*

Plaintiff testified that he was taking Doxycycline for skin problems and for his cyst,

Tylenol Number 3 for his pain, Amitriptyline "for sleep," and Tolectin for inflammation.  TR 29-

30.  Plaintiff added that he recently saw Dr. Fakhoury[10] at Vanderbilt, and that Dr. Fakhoury had

prescribed Nurontin.  TR 30.  Plaintiff stated that he had to "go get an EMG," but that he was

waiting to hear from his insurance company.  TR 31.

Plaintiff reported that the medications he was taking made him drowsy and made him feel

"kind of in limbo sometimes."  TR 31.  Plaintiff stated that he had had a consultation with a

"stomach doctor" regarding another medication, Naproxen, that was irritating his stomach.  *Id.*

Plaintiff reported that he was no longer taking this medication.  *Id.*

Plaintiff testified that a doctor evaluated him for depression, but that he could not recall

the name of that doctor.  TR 32.  Plaintiff's attorney asked Plaintiff if the doctor in question was

Dr. Rohr,[11] and Plaintiff replied that it was.  *Id.*  Plaintiff explained that he felt depressed because

---

[9]The hearing transcript mistakenly refers to Dr. Fuchs as Dr. Feuks.  TR 28.

[10]The hearing transcript mistakenly refers to Dr. Fakhoury as Dr. Foquri.

[11]The hearing transcript mistakenly refers to Dr. Rohr as Dr. Roar.

18

he was the "bread winner" for his family for 20 years, and at the time of the hearing, his wife was "carrying everything." *Id.*

Plaintiff testified that he had difficulty standing. TR 32. Specifically, Plaintiff reported that when he stood, he had "trouble" in his legs, ankles, and back. *Id.* Plaintiff added that when he stood up, his "back goes out." TR 32-33. He sated, "I get like a knot in it but it goes and comes and it's mostly the legs from the knees down." *Id.* Plaintiff reported that he could usually stand for 30 to 45 minutes before he started getting "real uncomfortable." TR 33. Plaintiff added that after he got "real uncomfortable," he had to sit down or stretch. *Id.*

Plaintiff reported that he also had difficulty sitting. TR 33. Plaintiff explained that he had a cyst on his tailbone that "got sore" when he would sit. *Id.* Plaintiff added that he was taking Doxycycline for his cyst. *Id.* Plaintiff estimated that he could sit for an hour and 15 minutes to an hour and a half before his tailbone began hurting. *Id.* Plaintiff testified that once his tailbone began to hurt, he would get up, stretch, and walk until he was comfortable again. TR 34.

Plaintiff stated that he had trouble walking, and that he could only walk for short distances before experiencing pain in his ankles and legs. TR 34. Plaintiff estimated that he could walk to his mailbox and back from his house before he started experiencing pain. *Id.* Plaintiff added that his mailbox was approximately 75 yards from his house. *Id.* Plaintiff reported that after walking long distances, his knees would ache. *Id.*

Plaintiff testified that his ability to lift things had been affected by "this condition." TR 34. Specifically, Plaintiff stated that he had no strength in his left arm, and that the strength in his right arm was "fair." TR 34-35. Plaintiff reported that he had tendinitis in his left arm. *Id.*

19

Plaintiff stated that if he was using both arms, he could lift 30 or 40 pounds, but that he could not lift that weight very often. *Id.* Plaintiff added that he would have difficulty carrying that weight because he would not be able to stabilize the load with his left arm. *Id.*

Plaintiff testified that he was not able to climb because it made him "dizzy and woozy." TR 35. Plaintiff added that he would have difficulty stooping, crouching, kneeling, and engaging in other similar movements. *Id.* Plaintiff stated that "any bending or on my knees and stuff, it's just, I'm done for the day." *Id.* Plaintiff stated that he had not attempted pulling or pushing, and that he had not discussed any possible pushing or pulling limitations with his doctor. TR 36.

Plaintiff testified that he owned his home and that the only stairs in his house were in the front of the house. TR 36. Plaintiff reported that he drove "very little" and that his car had automatic transmission. *Id.* Plaintiff added that his wife drove him to the hearing and that he did not drive long distances. TR 36-37. Plaintiff stated that he would not be able to return to his "cement working job" because he would not be physically capable of doing the work. TR 37.

Plaintiff reported that he did not think that he could return to his maintenance job because of his physical limitations. TR 37.

Plaintiff reported that during the day, he tried to help his wife with the housework by doing dishes, cooking frozen food, or doing laundry. TR 38. Plaintiff reported that he watched television, and that he tried to "mow a little lawn." *Id.* Plaintiff testified that he had one friend with whom he went out about once a week. *Id.* Plaintiff stated that he occasionally went to the grocery store, but not if it involved "any big shopping." *Id.*

Plaintiff stated that he enjoyed training beagles to hunt as a hobby, and that he and his

wife had three dogs.  TR 39.  Plaintiff reported that he tried to go hunting, but that he was currently "more an armchair hunter."  *Id.*  Plaintiff stated that in the past year, he had gone hunting two or three times for a total of approximately two and a half hours.  *Id.*

Plaintiff testified that he did "a little fishing," when he could "sit on a bucket or something for a little while."  TR 39.

Plaintiff testified that he had a 21 year old daughter living at home with him and his wife.  TR 39.  Plaintiff stated that his daughter worked during the day and that he was home alone "most of the time" during the day.  *Id.*  Plaintiff reported that his wife worked for Mayberry Nursing Home in Jackson County.[12]  *Id.*

### C.  January 11, 2002 Hearing

### Plaintiff's Testimony

Plaintiff essentially reiterated his testimony from the previous hearing regarding his age, education, and work experience.  TR 248-249.

Plaintiff reported that the conditions that kept him from working were a cyst, and arthritis in his knees, wrist, and fingers.  TR 250. Plaintiff stated that the cysts were associated with his arthritis, and that he had been seeing doctors "for about 15 years" for this condition.  *Id.* Plaintiff added that his "final diagnosis" regarding his arthritis was made "about seven years ago."  TR 250-251.

Plaintiff testified that his arthritis had gotten worse, and that his pain was mainly in his wrists, knees, and hands.  TR 251.  Plaintiff added that he occasionally had pain in his shoulders

---

[12]As discussed above, no Vocational Expert testified at this hearing.

if he did any overhead lifting. *Id.* Plaintiff reported that the pain in his knees was constant, but that it got worse when he stood, ran, or did anything that caused pounding on the knee. TR 251.

Plaintiff reported that he soaked in a bathtub three to four times daily and that he used a treatment of powdered bleach, powdered Tide, and peroxide. TR 252. Plaintiff stated that this treatment was designed to cleanse his cysts and that his cysts started "flaring up" if he did not take these baths. *Id.* Plaintiff reported that most of the cysts were in his underarms and tailbone, but that he occasionally got them on his neck and back. *Id.* Plaintiff reported that he had not gotten a cyst on his hand. TR 253.

Plaintiff reported that he also took medication to treat his cysts and that his medication caused drowsiness. TR 253. Plaintiff stated that he had previously taken medication that irritated his stomach. *Id.*

Plaintiff reported that he would lie down three to four times a day to relieve his pain. TR 253. Plaintiff added that he usually sat down after he took his medication. *Id.* Plaintiff stated that Dr. Hallmark advised him to elevate his feet and that he elevated his feet "every four hours or so" for 10 or 15 minutes. TR 253-254.

Plaintiff stated that he had problems with his hands which occasionally caused him problems with gripping. TR 254. Plaintiff reported that on an average day, he could stand for "about hour [*sic*]" at a time. *Id.* Plaintiff speculated that in an eight-hour period, he could stand on his feet between three and four hours. *Id.* Plaintiff testified that he had a hard time sitting for long periods of time and that he could sit for 30 to 45 minutes at a time before he started experiencing pain. *Id.* Plaintiff stated that he thought that he could sit in a chair between two and three hours in an eight-hour period. TR 255.

22

Plaintiff reported that he thought that he could lift up to 20 pounds at a single time and that he could lift 10 pounds "constantly." TR 255. Plaintiff added that on an average day, he got up, and would "piddle around the house, basically, you know, watch a few movies, go outside, piddle around out there, not much stuff to do, but, you know, just, just try to get out and move around." *Id.* Plaintiff added that he would then soak in the bathtub and take his medication. *Id.* Plaintiff added that his activities had been "this limited" for about seven or eight years. *Id.*

Plaintiff stated that he did not have hobbies or activities that he enjoyed but that he went out with his wife two or three times a year. TR 255-256. Plaintiff added that he still went fishing and that he had gone fishing three times in the past year. TR 256. Plaintiff added that he had to cut back on fishing in the past two and a half years. *Id.*

Plaintiff stated that he no longer raised beagles and that he stopped raising beagles three or four years previously. *Id.* Plaintiff added that he did the laundry "maybe once a week" to "try to get Brownie points." *Id.* Plaintiff stated that he occasionally did some cooking. TR 257.

Plaintiff reported that Dr. Hallmark was his primary doctor, and that he saw Dr. Hallmark "about once a month." TR 257. Plaintiff added that he had been seeing Dr. Hallmark for three or four years. *Id.*

Next, the VE asked questions of Plaintiff. TR 257. The VE asked Plaintiff about a job in Plaintiff's file that was referred to as "supervisor of buildings." *Id.* Plaintiff stated that this title referred to his job as "groundskeeper" for the museum, and they "just gave me a good title." *Id.* Plaintiff stated that he supervised "three young kids" during the summer but that he was not a department head. TR 258.

## **Vocational Testimony**

Vocational expert ("VE"), Kenneth Anchor, also testified at Plaintiff's hearing. TR 258-262.

The VE testified that Plaintiff's past relevant work as a concrete laborer was medium to heavy exertion and unskilled. TR 258. The VE further testified that Plaintiff's past relevant work as a groundskeeper and maintenance worker was medium and semiskilled. *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 258. The VE answered that the hypothetical claimant could work as a technician, machine tender, table worker, packer, polisher, or folder. TR 259. The VE answered that in the State of Tennessee, there are at least 34,000 of these light jobs available, all of which would be appropriate for the hypothetical claimant. *Id.*

The ALJ modified the hypothetical and asked the VE whether the number of jobs suitable for the hypothetical claimant would change if a sit/stand option were required. TR 259. The VE answered that this limitation would reduce the number of jobs available to approximately 20,000, and that this reduction would be "across the whole spectrum" of jobs. *Id.*

Plaintiff's attorney then asked the VE about a narrative recorded by Dr. Fuchs. TR 259; 209. The attorney read Dr. Fuchs' narrative out loud to the VE. TR 260. The VE responded that it was unclear to him whether the limitations described by Dr. Fuchs would allow for full time work. TR 261. The VE stated that if Dr. Fuchs' limitations precluded full time work, then none of the jobs the VE mentioned would be available. *Id.* The VE stated that "perhaps some sedentary jobs" would be available for an individual with the limitations described by Dr. Fuchs.

*Id.* The VE explained that whether work was available depended on whether "that allowed for an eight-hour day." TR 261.

Plaintiff's attorney then asked the VE about an assessment from Dr. Hallmark. TR 262; 415-417. The VE stated that if Dr. Hallmark's assessment were found to be credible, then the claimant would be precluded from all full time work. TR 262. The VE further testified that if Plaintiff's testimony were found to be credible, then he did not believe that "full-time work could be satisfactorily performed in a way that would meet minimal employer requirements." *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner

if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he

or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[13] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175,

1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by

relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the

claimant is not significantly limited by a nonexertional impairment, and then only when the

---

[13]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

claimant's characteristics identically match the characteristics of the applicable grid rule.

Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability

determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's

disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with

particularized proof of the claimant's individual vocational qualifications to perform specific

jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*,

820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages

four and five above, the Commissioner is required to consider the combined effect of all the

claimant's impairments; mental and physical, exertional and nonexertional, severe and

nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).


### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ failed to provide a proper basis for rejecting the opinions

of Drs. Fuchs and Hallmark. Docket Entry No. 9. Accordingly, Plaintiff maintains that,

pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying, or
> reversing the decision of the Commissioner of Social Security,
> with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can

be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is

Case 2:03-cv-00080   Document 21   Filed 07/15/05   Page 28 of 32 PageID #: 28

overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>
> (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

29

...

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis

for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of

Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical
> source who provides you or has provided you, with medical
> treatment or evaluation and who has, or has had, an ongoing
> treatment relationship with you.

20 C.F.R. § 404.1502.

Drs. Fuchs and Hallmark treated Plaintiff for extensive periods of time, a fact that would

justify the ALJ's giving greater weight to their opinions than to other opinions. In the case at bar,

the ALJ examined the relevant medical evidence, Plaintiff's testimony, and Plaintiff's

documentary statements regarding his capabilities and daily activities.  TR 235-237.  The ALJ

determined that the reports of Dr. Fuchs and Dr. Hallmark were inconsistent with Plaintiff's

statements regarding his daily activities, as well as evidence regarding Plaintiff's response to

medical treatment.  TR 236-237.  Specifically, the ALJ stated as follows:

> The claimant's treating physician, Dr. Fuchs, reported that Mr.
> Madison, had severe limitations of function, but could lift up to 10
> pounds, walk/stand at least a third of a workday for one-half hour
> at a time, could sit for 4 hours, had a limited ability to perform
> work-related activities such as reaching and handling objects, and
> should avoid working in hazardous environments.  Exhibit 36.
> More recently, another physician who has provided some medical
> care for the claimant, Dr. Hallmark, has completed a medical
> source statement indicating that Mr. Madison can lift up to 20
> pounds, walk/stand a total of 3 hours during a workday for one
> hour at a time, can sit 2 hours for one-half hour at a time, has an
> impaired ability to perform fine manipulation with his hands, and
> has other limitations such as a need to elevate his legs.  Exhibit 55.

Ordinarily, the opinions of treating physicians are entitled to greater weight than the opinions of nontreating physicians, as indicated in Social Security Regulations 404.1527(d)(2) and 416.927(d)(2). However, in the instant case, the evidence indicates that Mr. Madison's own activities demonstrate that he has retained a greater functional capacity than suggested by his treating physicians. Thus, pursuant to 20 CFR 404.1527(d)(6) and 416.927(d)(6), the opinions of the treating physicians are not being given the great weight generally attributed to the opinions of treating physicians.

In contrast to his allegations of disability, the evidence reveals that the claimant has retained the capacity to be fairly active. (i.e., Exhibits 18-20, 26, 27, 31, 39; and 50). He had beagles for hunting, caring for the dogs and going rabbit hunting. He went fishing intermittently. While his wife worked, he engaged in household activities such as vacuuming, doing the dishes, cooking, performing odd jobs, and doing laundry. He used a riding mower, and cut the lawn. On various occasions, physicians had noted that he is well tanned. He was able to drive short distances, and went grocery shopping. He walked for some exercise, and visited with friends. He read and watched television. He was a grandfather, and played with his grandson. The evidence reveals that he did other work around the house, doing some painting and working on the roof. Exhibit s 27 and 50, page 11. He was unable to engage in strenuous physical activity on a continuous basis, but could be active.

TR 236.

As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.*

Because the opinions of Drs. Fuchs and Hallmark contradict other substantial evidence of record, the Regulations do not mandate that the ALJ accord Dr. Fuchs' and Dr. Hallmark's

evaluations controlling weight.  Accordingly, Plaintiff's argument fails.


## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Pleadings be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

E. CLIFTON KNOWLES
United States Magistrate Judge